UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CJPS HEALTHCARE
SUPPLIES & EQUIPMENT,

       Plaintiff/Counter-Defendant,

vs.

Civil Action No.
12-CV-14885

HON. MARK A. GOLDSMITH

ANSAR MEDICAL
TECHNOLOGIES, INC.,

       Defendant/Counter-Plaintiff.
_____/

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. 17)

#### I.    INTRODUCTION

The claims in this case arise out of a contractual relationship between Plaintiff/Counter-Defendant CJPS Healthcare Supplies & Equipment ("Plaintiff") and Defendant/Counter-Plaintiff Ansar Medical Technologies, Inc. ("Defendant"), regarding a purported lease of medical monitoring equipment. The Amended Complaint brings claims of breach of contract and conversion, and seeks an order (i) awarding Plaintiff $1,290,730.40 in damages and (ii) requiring Defendant to return possession of the equipment to Plaintiff (Dkt. 16). Defendant brings counter-claims of breach of contract, breach of warranty, and fraud (Dkt. 21). On February 20, 2013, Plaintiff filed the instant motion for a preliminary injunction (Dkt. 17), to prevent Defendant from transferring the leased equipment and to require Defendant to make payments into escrow. On July 25, 2013, the Court conducted oral argument on the motion. For the reasons that follow, the Court grants in part and denies in part the motion for a preliminary injunction.

1

## II.   BACKGROUND[1]

Plaintiff CJPS is a distributor of medical equipment and supplies. Sevrain Aff. ¶ 3 (Ex. 1 to Pl. Mot., Dkt. 17-2). Defendant Ansar markets, sells, and leases medical equipment to hospitals and clinics; as part of this business, Defendant combines medical monitoring equipment with Defendant's proprietary software designed to interpret the monitored data, and sells the integrated unit. Welch Aff. ¶¶ 1, 3 (Dkt. 26). In 2004, Christophe Sevrain, the current president of Plaintiff, headed Delphi Medical Systems, Corp., which entered into a licensing agreement to manufacture and sell Zoe Medical Monitors. Sevrain Aff. ¶ 7. Delphi modified the Zoe monitors and marketed them under the name "VitalPoint." Id. In 2010, Plaintiff acquired the VitalPoint business from Delphi and started distributing VitalPoint monitors. Id. ¶ 8. Before contracting with Plaintiff, Defendant used the Zoe monitors in the combined devices it sold; however, the Zoe monitor had various problems, and the FDA audited Defendant regarding its use of the Zoe monitor. Welch Aff. ¶¶ 3-7. Defendant began searching for a replacement monitor. Id. ¶ 9.

In October 2011, Defendant placed an order for "VA-101 3yr lease" of 20 VitalPoint monitors. Order (Ex. 6 to Pl. Mot., Dkt. 17-7). Robert Welch, the president of Defendant, maintains that, in a November 2011 meeting between Mr. Sevrain, Mr. Welch, and several of Defendant's representatives, Mr. Sevrain told Defendant's representatives that "the CJPS

---

[1] These facts are gleaned from exhibits attached to the parties' briefs. Because any facts in dispute are not material to the Court's resolution of the instant motion, the Court did not conduct an evidentiary hearing in this matter. See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 553 (6th Cir. 2007) ("Where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held. However, where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing." (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1312-1313 (11th Cir. 1998)).

monitor was CJPS's own, independent creation, was a better design and quality than the Zoe monitor, and would experience less problems and downtime than the Zoe monitor." Welch Aff. ¶ 14. In November 2011, Defendant placed an order for "US-101 5 year lease VitalPoint Pro Monitor," with 20 monitors delivered per month for a year for a total of 240 monitors. Servain Aff. ¶ 13; Invoice (Ex. 8 to Pl. Mot., Dkt. 17-9). The invoice indicates that the unit price was $93.20 per month per device. Id.

Mr. Sevrain sent a payment schedule spreadsheet to Mr. Welch, with an email stating, "I have attached the detailed spreadsheet of leasing 240 units (at a rate of 20 units per month for one year) over a 5-year lease." Emails (Ex. 10 to Pl. Mot., Dkt. 17-11) (emphasis in original). Mr. Welch responded, "we hereby acknowledge the excel spreadsheet is the payments schedule." Id. Defendant began using the VitalPoint monitors in its ANX 3.0 product. Email (Ex. 22 to Pl. Mot., Dkt. 17-23).

The VitalPoint Remote Patient Monitoring System Master Lease Agreement, attached as Plaintiff's Exhibit 7 (Dkt. 17-8), provides that "All orders shall be expressly subject to the terms of this Agreement." Master Lease ¶ 1. However, Mr. Welch states, "Ansar was never presented with a paper copy of the Master Lease, did not sign the Master Lease, and did not agree to the terms of the Master Lease when it placed its orders." Welch Aff. ¶ 17.

In summer 2012, Defendant began noticing some problems with the VitalPoint monitors, including some issues that were similar to those of the Zoe monitors. Welch Aff. ¶¶ 21-25. Mr. Welch states that it was then that Mr. Sevrain told him "the CJPS monitors were built using the Zoe plans and specifications, rather than being CJPS's own, new creation as Mr. Sevrain had claimed." Id. ¶¶ 26-27. Mr. Welch states, "Ansar would not have entered into the contract with CJPS if it had known that the CJPS monitors were the same faulty design and specifications as

3

the Zoe monitors." Id. ¶ 28. Defendant was able to repair most of the monitors, but occasionally a monitor would have to be replaced. Id. ¶ 35.

In September and October of 2012, Mr. Sevrain sent emails to Mr. Welch regarding the payments due on those months. Emails, Ex. 15 to Pl. Mot. at 15-31 (Dkt. 17-16). The emails indicate that a credit card used to make a payment was declined, id. at 15, that one of Defendant's credit cards was cancelled due to unauthorized expenditures, id. at 17, and that one of Defendant's wire transfers did not go through due to insufficient funds in the account. Id. at 27. In his affidavit, Mr. Welch states, "Ansar ceased making monthly payments after October 2012 not because of a financial inability to do so, but as a set-off for CJPS's fraud and breach of contract and warranties." Welch Aff. ¶ 40. According to Mr. Sevrain, "Ansar never claimed it was withholding payments because of problems with the Leased Units." Sevrain Aff. ¶ 21. It is undisputed that Defendant made no payments after October 2012.

On November 2, 2012, the Food and Drug Administration (FDA) sent a warning letter to Defendant, stating that an FDA inspection revealed that the ANX 3.0 was adulterated and misbranded. FDA Warning Letter (Ex. 17 to Pl. Mot., Dkt. 17-18).

### III. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted). The factors for a district court to consider in determining whether to grant a motion for preliminary injunction are "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the

injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." Six Clinics Holding Corp., II v. Cafcomb Sys., Inc., 119 F.3d 393, 399 (6th Cir. 1997). "A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue." Id. Furthermore, no single factor is determinative; the "four considerations . . . are factors to be balanced." Id. at 400.

## IV. ANALYSIS

Plaintiff requests an order preventing Defendant from selling or transferring the leased units and requiring past-due and ongoing disputed rental payments to be transferred into an escrow account. Pl. Br. on Mot. at 11 (Dkt. 17). Plaintiff also seeks an order permitting Plaintiff to inspect the leased units, although it states that its request to inspect the units is "ancillary" to the injunctive relief it seeks. Pl. Rep. at 2 (Dkt. 29). Defendant responds that an injunction restraining Defendant from transferring any of the units is unnecessary, because Defendant is willing to stipulate to an order barring Defendant from selling or transferring any of the monitors while the suit is pending, unless an existing customer needs a replacement monitor. Def. Resp. at 8 (Dkt. 24). Defendant further asserts that Plaintiff did not seek concurrence regarding Plaintiff's inspection of the units, so that argument is waived. Id. at 8-9. The rest of Defendant's brief argues that an order directing rental payments into an escrow fund is not warranted.

Because Defendant is willing to stipulate to an order barring it from most sales or transfers of the leased units (except to replace existing customers' units), the Court considers whether Plaintiff has met its burden of showing that preliminary injunctive relief is required to (i) order Defendant to refrain from selling or transferring the leased units to existing customers,

5

(ii) order Defendant to pay past-due and ongoing rental payments into an escrow account,[2] and (iii) permit Plaintiff to inspect the leased units. The Court considers, in turn, each of the four factors to be weighed.

### A. Likelihood of Success on the Merits

Plaintiff contends that it is likely to succeed on its breach of contract claim, because it has a strong likelihood of overcoming the breach of warranty and fraudulent inducement defenses Defendant raised to justify its failure to pay. Pl. Br. on Mot. at 12. Plaintiff argues that the defenses raised are barred by the Master Lease Agreement, by Defendant's acceptance of the leased units, and by Defendant's failure to tender the payments owed. Id. at 12-13. Defendant responds that Plaintiff will not likely succeed on the merits because Defendant argues that it never signed the Master Lease and is not bound by it. Id. at 10. It further argues that its acceptance of the monitoring units does not impair its remedies for nonconformance and that its fraudulent inducement counterclaim will undermine Plaintiff's claims. Id. at 11-12.

The parties do not dispute that the transaction at issue – the transfer of the medical monitoring units – is governed by the Uniform Commercial Code (UCC). Nor do the parties dispute that Michigan law applies to the claims at issue.[3] The Court, therefore, turns to applicable provisions of the Michigan UCC, Mich. Comp. Laws § 440.1101, et seq., to determine Plaintiff's likelihood of succeeding on its breach of contract claim.

As an initial matter, the parties disagree about which provisions of the UCC govern this

---

[2] The Court notes that although the motion requests current, past-due, and future monthly payments to be paid into an escrow account, at the oral argument held on the instant motion, Plaintiff's counsel stated that Plaintiff was seeking an escrow account of "ongoing payments, not the full amount that we're seeking." Tr. at 4.

[3] Although Defendant, in its Answer to Amended Complaint, denies that the parties entered in an agreement for disputes to be governed by Michigan law, Answer ¶ 4 (Dkt. 21), Defendant's brief relies on Michigan cases and on the Michigan Uniform Commercial Code.

action because they dispute whether the transaction at issue was a lease or a sale. A "sale" involves "the passing of title from the seller to the buyer for a price," Mich. Comp. Laws. § 440.2106(1), whereas a "lease" is the "the transfer of the right to possession and use of goods for a term in return for consideration." Mich. Comp. Laws § 440.2803(j). Defendant contends that the transaction at issue was a purchase of the monitors that involved a transfer of title, not a lease. Def. Resp. at 7 ("Ansar decided to purchase its monitors from CJPS."); Def. Answer to Am. Compl. ¶ 12 (Dkt. 21) ("Ansar denies as untrue that the November 11, 2011 purchase order was a regular lease.").

The Court concludes that the record evidence indicates that the transaction was a lease, not a sale. The invoices reflect that Defendant placed an order for a "5 year lease" of the VitalPoint monitors. See Ex. 8. to Pl. Mot. Furthermore, in an email that was sent by Mr. Sevrain and acknowledged by Mr. Welch, Mr. Sevrain listed the payment schedule for the described "5-year lease." Ex. 10 to Pl. Mot. (emphasis in original). Defendant has presented no evidence indicating that the intent of the parties or the terms of agreement provided for a transfer of title to the units; the affidavit of Mr. Welch states only that "[Ansar] placed an order for 240 monitors on November 11, 2011." Welch Aff. ¶ 16. Because there is no dispute in the record evidence that the transaction was a lease, the Court applies the provisions of the UCC regarding leases.

"A lessee must pay rent for any goods accepted in accordance with the lease contract, with due allowance for goods rightfully rejected or not delivered." Mich. Comp. Laws § 440.2966(1). "Acceptance of goods occurs after the lessee has had a reasonable opportunity to inspect the goods and . . . signifies or acts with respect to the goods in a manner that signifies to the lessor or the supplier that the goods are conforming or that the lessee will take or retain them

in spite of their nonconformity." Mich. Comp. Laws § 440.2965(1). "If a lessee . . . fails to make a payment when due . . . then, with respect to any goods involved, the lessee is in default under the lease contract and the lessor may . . . [w]ithhold delivery of the goods and take possession of goods previously delivered." Mich. Comp. Laws § 440.2973.

Here, Defendant does not dispute that it accepted the VitalPoint monitors and continues to retain them. Therefore, Defendant was under an obligation to pay rent for the monitors accepted. Under the UCC, Defendant's failure to pay rent due for multiple months means that Defendant is in default. Defendant, however, argues that it is entitled to withhold the rent payments due to set-off. It contends that "[s]tarting with the October 2012 payments, Ansar decided to cease making monthly payments as a set-off for damages it has incurred from CJPS's fraud and breach of contract arising from delivery of the defective monitors, as authorized by the UCC." Def. Resp. at 15 n.6.

The UCC provides that if a lessor fails to deliver conforming goods or is otherwise in default, "a lessee, on notifying the lessor of the lessee's intention to do so, may deduct all or any part of the damages resulting from any default under the lease contract from any part of the rent still due under the same lease contract." Mich. Comp. Laws § 440.2958(6). "The defendant bears the burden of proving that the plaintiff breached the contract from which the defendant seeks a setoff or recoupment." McCoig Materials, LLC v. Galui Const., Inc., 818 N.W.2d 410, 416 (Mich. Ct. App. 2012).

The Court concludes that Defendant's set-off defense does not excuse Defendant from paying its past-due and ongoing rental payments, for two reasons: (i) Defendant has not shown that the amount of the set-off equals the amount of payments due; and (ii) Defendant has not indicated that it properly provided the notice required to deduct damages as a set-off.

Set-off would only entitle Defendant to deduct from the remaining payments due the amount of damages incurred, not to cease making payments altogether. See Purofied Down Prods. Corp. v. Royal Down Prods., 87 F.R.D. 685, 688 (W.D. Mich. 1980) (noting that the UCC sales set-off provision "authorizes the buyer to deduct damages from the purchase price, so long as the buyer notifies the seller of its intent to deduct damages, and provided that the buyer only deducts from the purchase price due on a contract such damages as arise under the same contract."). However, Defendant has presented no evidence regarding the monetary amount of damages it incurred; in particular, there is no evidence in the record of the cost of repairing or replacing the monitors, or of any other alleged damages. Absent such evidence, the Court cannot conclude that Defendant was entitled to stop making rental payments due to set-off. See Antricran v. Grand Exhaust Sys., Inc., 956 F.2d 268, at *8 (Table) (6th Cir. 1992) ("In failing to provide the court with accurate and trustworthy evidence establishing the amount [of] the setoff, the defendants failed to carry their burden.").[4] Defendant's invocation of set-off is therefore insufficient to excuse its failure to pay.

There is a second reason Defendant's argument regarding set-off lacks merit: Defendant does not claim that it provided notice to Plaintiff of its intent to deduct damages from the rental payments, as it was required to do under Mich. Comp. Laws § 440.2958(6). Mr. Sevrain states in his affidavit that "Ansar never claimed it was withholding payments because of problems with the Leased Units." Sevrain Aff. ¶ 21. Furthermore, none of the exhibits includes any indication that Defendant notified Plaintiff of Defendant's intention to stop making rental payments based on the theory of set-off. Without such notice, Defendant's reliance on set-off is not proper.

---

[4] In Anticran, the Sixth Circuit applied Tennessee law, which like Michigan law "places the burden of proving setoff on the party who claims it." Antrican, 956 F.2d at *8.

9

Because Defendant has presented no evidence of the damage it allegedly suffered due to the alleged fraud and defects and because it provided no notice of set-off, Defendant is not likely to show that it is relieved of its payment obligation under the UCC. Therefore, Plaintiff is likely to prevail on its breach of contract claim.

### B. Irreparable Injury

Plaintiff argues that without an injunction, it will experience irreparable harm based on the transfer and dissipation of its interest in the leased units, and because Defendant may lack the ability to satisfy a monetary claim. Pl. Br. on Mot. at 13-14. Plaintiff argues that a limited escrow account is necessary to ensure there are sufficient funds to disburse upon resolution of the case. Id. at 14. Defendant responds that Plaintiff has not shown irreparable injury that would warrant the escrow order, because money damages would adequately compensate Plaintiff's injury. Def. Resp. at 13. It contends that there is no evidence Defendant would lack the ability to satisfy a money judgment. Id. at 14.

The Court concludes that Plaintiff has established that it would suffer irreparable harm from continued transfer of the leased units from Defendant to Defendant's customers. The Michigan UCC provides:

> Goods are accessions when they are installed in or affixed to other goods. . . . The interest of a lessor or a lessee under a lease contract . . . is subordinate to the interest of . . . a buyer in the ordinary course of business or a lessee in the ordinary course of business of any interest in the whole acquired after the goods became accessions.

Mich. Comp. Laws § 440.2910. Therefore, when Defendant combines the VitalPoint monitors with other equipment and sells the resulting, combined product, the purchaser may acquire a superior interest in the VitalPoint monitor, thus dissipating Plaintiff's interest in the monitors. Where there is "a strong indication that the defendant may dissipate or conceal assets" in which

10

the plaintiff has an interest, the irreparable injury factor favors the issuance of a preliminary injunction. Micro Signal Research, Inc. v. Otus, 417 F.3d 28, 31 (1st Cir. 2005). The irreparable injury factor thus weighs toward ordering Defendant to refrain from selling or transferring any of the leased units, including selling replacement units to existing customers. See also Tocco v. Tocco, 409 F. Supp. 2d 816, 831-832 (E.D. Mich. 2005) (enjoining the defendant from transferring assets in which the plaintiff had a security interest).

However, the irreparable injury factor weighs against ordering a limited escrow account for the disputed payments. Generally, financial loss is insufficient to support the issuance of a preliminary injunction. Sampson v. Murray, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (citations and quotation marks omitted)). See also Contech Castings, LLC v. ZF Steering Sys., __F. Supp. 2d__, 2013 WL 1173990, at *6 (E.D. Mich. 2013) ("[T]he law is settled that a party moving for a preliminary injunction must establish more than mere monetary injury."). In the instant case, the escrow account would guard against a potential harm that is purely financial – the loss of rental payments – and could be fully compensated by a damages award.

Plaintiff cites several cases in which the court found that financial injury was sufficient to constitute irreparable harm, but these cases are distinguishable because they deal with extraordinary circumstances that are not present here: (i) an insolvent defendant, and/or (ii) a strong possibility that the plaintiff would not receive adequate compensatory relief in the absence of an injunction.[5]

---

[5] In Deckert v. Independence Shares Corporation, 311 U.S. 282, 290-291 (1940), the Court held that where the defendant "was insolvent and its assets in danger of dissipation or depletion," the possibility of legal remedy was inadequate and a temporary injunction restraining the transfer of

11

Here, however, there has been no indication that the legal remedy of damages would be inadequate to compensate any financial harm incurred by Plaintiff. Plaintiff argues that evidence in the record demonstrates that Defendant is insolvent, because Defendant made several late payments and because, in October of 2012, a wire transfer from Defendant was not completed due to insufficient funds in Defendant's account. The Court disagrees.

The Sixth Circuit has noted that "[d]efinitions of insolvency vary." Roth Steel Tube Co. v. C.I.R., 620 F.2d 1176, 1181 (6th Cir. 1980). The UCC defines "insolvent" as "[h]aving generally ceased to pay debts in the ordinary course of business other than as a result of a bona fide dispute"; "[b]eing unable to pay debts as they become due"; or "[b]eing insolvent within the meaning of federal bankruptcy law." Mich. Comp. Laws § 440.1201(w). See also Black's Law Dictionary 867 (9th ed. 2009) (distinguishing between "balance-sheet insolvency," when a debtor's liabilities exceed its assets, and "equity insolvency," when a debtor cannot meet its obligations as they become due).

In the instant case, the record contains no financial statements or other evidence that would reveal Defendant's total assets and liabilities. Without evidence of Defendant's continuing finances, the Court cannot conclude that Defendant is insolvent and would be unable

---

funds was properly issued. In Plainfield Specialty Holdings II Inc. v. Children's Legal Services PLLC, 634 F. Supp. 2d 833, 846 (E.D. Mich. 2009), the court concluded that the plaintiff, a lender, had a perfected security interest in all of the defendant's assets. The defendant sought to divert various proceeds pledged as security to the plaintiff, and the court concluded that "Plaintiff has demonstrated that it is likely to not have recourse to other funds should these be depleted." Id. Confronting a situation where the plaintiff was unlikely to receive an adequate financial remedy in the absence of an injunction, the court ordered the defendant to pay the collateral. Finally, in Tocco, 409 F.Supp.2d at 831-832, the court concluded that although the plaintiffs only claimed financial harm, the plaintiff was nevertheless facing irreparable injury in the absence of an injunction. Id. at 831. The court explained, "due to the extraordinary facts of this case . . . there is a strong possibility that corrective relief will not be available to Plaintiffs in the ordinary course of litigation absent an injunction." Id.

to satisfy a money judgment. One payment that was bounced for insufficient funds from one account does not mean that Defendant, as a business entity, is unable to satisfy its debts. See Nanjing Textiles IMP/EXP Corp., Ltd. v. NCC Sportswear Corp., No. 06-cv-52, 2006 WL 2337186, at *4 (S.D.N.Y. Aug. 11, 2006) ("Standing alone, a check makes no representation of solvency. A solvent party, while perfectly willing and able to satisfy all outstanding debts, may issue a check that is later dishonored because the particular account from which the check is drawn contains insufficient funds. Conversely, an insolvent party may issue a check that is later honored.").

The Court further concludes that Plaintiff has not shown that Defendant has "generally ceased to pay debts in the ordinary course of business other than as a result of a bona fide dispute." Although it is undisputed that Defendant has ceased making payments to Plaintiff, there has been no evidence presented of Defendant's other business relations, and whether Defendant has generally ceased paying its debts to all of its creditors. Therefore, Plaintiff has not demonstrated that Defendant is insolvent or that other extraordinary circumstances exist that would render compensatory relief inadequate.

For these reasons, the Court concludes that Plaintiff has not shown that it would suffer irreparable injury in the absence of an escrow account.

### 3. Substantial Harm to Others

Plaintiff argues that a preliminary injunction would not result in substantial harm to others. Pl. Br. on Mot. at 14. Plaintiff contends that if there is indeed a problem with the leased units, Defendant's customers would not be harmed by an order preventing the transfer of the units. Id. at 14-15. Defendant contends that this argument is moot, because it has already agreed not to transfer any remaining monitors unless an existing customer needs a replacement. Def.

Resp. at 16.

The Court concludes that no substantial harm to others would result from granting injunctive relief. As Plaintiff points out, the FDA has issued a warning letter to Defendant indicating that the ANX 3.0 system, which Defendant created with Plaintiff's VitalPoint monitors, is adulterated and misbranded. Defendant also claims that the VitalPoint monitors eventually malfunction. Therefore, restraining Defendant from transferring the allegedly faulty leased units – including as replacement units to existing customers – would not result in substantial harm to Defendant's customers. This factor weighs in favor of granting injunctive relief.

### 4. Public Interest

Plaintiff argues that it is not in the public interest to protect Defendant's right to transfer allegedly faulty, adulterated, and misbranded devices. Pl. Br. on Mot. at 15. Defendant contends that the public interest factor weighs against issuing an injunction, because Plaintiff has unclean hands for two reasons: Plaintiff never received FDA approval to sell the Zoe monitors under Plaintiff's name; and Plaintiff defrauded Defendant regarding the monitors. Def. Br. at 16.

"The unclean-hands defense is not an automatic or absolute bar to relief; it is only one of the factors the court must consider when deciding whether to exercise its discretion and grant an injunction." 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure § 2946 (2d ed. 1995). Further, the Sixth Circuit has explained that the alleged "unclean hands" conduct must relate to the transaction that is the subject of the litigation:

> "The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." Novus Franchising, Inc. v. Taylor, 795 F. Supp. 122, 126 (M.D. Pa. 1992). The doctrine of unclean hands requires that the alleged misconduct on the part of the plaintiff relate directly to the transaction about

> which the plaintiff has made a complaint. Dollar Systems, Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 173 (9th Cir.1989). "Thus, the doctrine is to be applied 'only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.'" McMonagle, 868 F.2d at 1354 (quoting Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245–46, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933)).

Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1383 (6th Cir. 1995).

As an initial matter, the Court notes that Defendant's claim that Plaintiff is guilty of unclean hands because it did not receive FDA approval to sell Zoe monitors does not relate directly to the transaction – the lease contract between the parties regarding the VitalPoint monitors – about which Plaintiff has made a complaint. Defendant does not explain how the failure to secure FDA approval bears on the nature of the lease at issue here or any claimed defects, or would otherwise have an "immediate and necessary relation" to the relief sought by Plaintiff.

That leaves Defendant's assertion that Plaintiff defrauded Defendant regarding the nature of the monitors. In support of Defendant's fraudulent inducement claim, Defendant points to the affidavit of Robert Welch, which summarizes some statements made to Mr. Welch by Mr. Sevrain regarding alleged differences between the VitalPoint monitor and the Zoe monitor. Welch Aff. ¶¶ 14, 26, 27. From the affidavit alone, the Court cannot conclude that Plaintiff committed fraud. The affidavit does not state that Mr. Sevrain made the claimed representations with the intent that Defendant would act upon them; nor does the affidavit demonstrate that Defendant's reliance on the representations was reasonable. See Johnson v. Johnson, No. 307572, 2013 WL 2319473, at *2 (Mich. Ct. App. May 28, 2013) (noting that intent and reasonable reliance are required elements of a claim of fraudulent inducement).

Because the Court cannot conclude from the evidence presented by Defendant that

15

Plaintiff is liable for fraud, and because the mere possibility that a party has committed fraudulent conduct "is not the required finding that [a party's] actions rose to the level of fraud, deceit, unconscionability, or bad faith," Performance Unlimited, 52 F.3d at 1383, the unclean-hands defense based on allegedly fraudulent conduct does not bar the issuance of an injunction here.

### 5. Balancing the Factors

No single factor is dispositive in considering a motion for preliminary injunction. However, injunctive relief is generally unavailable "absent a showing of irreparable injury." City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983). Because Plaintiff has not shown that it will suffer irreparable harm in the absence of an order requiring Defendant to make payments into an escrow account, Plaintiff's motion is denied to the extent it seeks such relief.

Plaintiff also seeks an order barring the sale, lease, encumbrance, conveyance, or transfer of the leased units, including a bar on transferring the units to existing customers. As the Court explained above, Plaintiff has shown a strong likelihood of succeeding on the merits of its breach of contract claim, and has demonstrated that it will suffer irreparable injury if Defendant continues to transfer the leased units. There is no substantial harm to others or harm to the public interest that would incur as a result of an order restraining Defendant from transferring the monitors. Therefore, the Court grants Plaintiff's motion to the extent it seeks an order barring the sale, lease, encumbrance, conveyance, or transfer of the leased units.

Finally, Plaintiff requests an order permitting it to immediately inspect the monitors in Defendant's possession. The Court concludes that such an order is appropriate because it will assist Plaintiff in monitoring the location and condition of the equipment.

### V. CONCLUSION

For the reasons stated above, Plaintiff's motion for preliminary injunction is granted in part and denied in part. Defendant is barred from the sale, lease, encumbrance, conveyance, or transfer of the VitalPoint monitors. Defendant shall also make the monitors available for inspection by Plaintiff's representatives within 14 days of the issuance of this Opinion and Order.

SO ORDERED.

Dated: August 22, 2013
Flint, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 22, 2013.

s/Amanda Chubb for Deborah J. Goltz
DEBORAH J. GOLTZ
Case Manager